**James CADE, Appellant,**

v.

**STATE of Missouri, DEPARTMENT OF SOCIAL SERVICES, DIVISION OF FAMILY SERVICES, and Gary J. Stangler, Director Missouri Department of Social Services, Respondent.**

**No. WD 58518.**

Missouri Court of Appeals,
Western District.

March 27, 2001.

to demonstrate a substantial step toward the commission of statutory sodomy had occurred.

Mark Gilmer Rhodes Warren, Jefferson City, for appellant.

David S. Durbin, Jefferson City, for respondent.

Before Presiding Judge SMART, Judge ELLIS and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

James Cade appeals the trial court's judgment holding that Deputy Director Richard Matt of the Department of Family Services (DFS) had the authority as granted by the Director of Social Services (DSS) to develop, implement, and enforce dress code requirements at the time of Mr. Cade's suspension from DFS for failing to comply with its dress code. On appeal, Mr. Cade argues that an administrative agency head cannot delegate duties assigned to him or her by statute unless a statute expressly or impliedly permits such delegation. He argues that the Director did have authority to delegate the duty of dress code development, but that he could only do so expressly, since this type of duty is discretionary in nature, and failed to do so. We disagree.

We find the regulation at issue did expressly delegate the dress code formulation duty. Even had it not done so, we find that the authority to delegate the creation of a dress code can reasonably be implied from the nature of the duties involved. In any event, the cases Mr. Cade cites, requiring express authority to delegate, concern situations in which there is a question whether a statute permits a Director to delegate his or her statutory duties at all. Here, it is conceded that the Director can delegate dress code duties, and the only issue is how clearly he did so in an administrative policy. The statutory construction cases cited by Mr. Cade thus do not apply. Affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case was subject to a prior appeal, reported in *Cade v. State*, 990 S.W.2d 32 (Mo.App. W.D.1999) (hereinafter *Cade I* ). That decision sets out the underlying facts up to the time of the appeal in *Cade I*, and we repeat them here without quotation marks and with only minor stylistic changes, as follows:

DFS is a division of the Missouri Department of Social Services (DSS), created under Section 660.010.3, RSMo 1994. In May 1987, Administrative Policy 2–117 was adopted by DSS, providing that "[a]ll Department of Social Services (DSS) employees are expected to dress in a manner appropriate to the performance of their duties" and that "supervisors are reminded that . . . all requirements should be developed with . . . [reasonableness] in mind." This provision specified that department supervisors were to apply the policy fairly and equitably for all employees working in similar environments. James Cade, an employee of DFS, is a child placement coordinator for the Interstate Compact on the Placement of Children (ICPC). He

has been employed by DFS for twenty-six years. On January 21, 1993, Mr. Cade appeared at work without a necktie. The following day, January 22, 1993, Mr. Cade's supervisor, Karen Unger, sent a memorandum to Mr. Cade telling him that the agency required that men in his area of responsibility wear neckties. She advised him that his failure to wear a necktie could result in disciplinary action.

On January 25, 1993, Richard Matt, Deputy Director of Children's Services, sent a memorandum to the entire staff in the Children's Services Unit of DFS regarding appropriate office attire. This memorandum did not say that neckties were required for men, although a prior memorandum had stated that neckties were required. It is not clear whether Mr. Cade received a copy of the prior memorandum. A subsequent memorandum, issued on January 27, 1993, by Mr. Matt, did not mention neckties.

On September 25, 1995, Mr. Cade came to work without a necktie. On September 28, 1995, Ms. Unger sent Mr. Cade an e-mail message stating that Mr. Cade had been seen without a necktie and admonished him to "abide by the dress code which includes wearing a tie." On October 2, 1995, Mr. Cade told Ms. Unger that he refused to wear a tie, and he did not believe that the agency could require that he wear one. On October 10, 1995, Ms. Unger notified Mr. Cade that he would be suspended without pay for one day, because he "failed to respond in a reasonable manner to the lawful orders [or] instructions of persons with duly delegated authority over the employee" by failing to wear a necktie.

On October 10, 1995, Mr. Cade filed a Step I Grievance concerning his suspension, alleging that the necktie policy constituted sexual discrimination and harassment. Mr. Cade asked for recovery of one

day's pay and costs. He also asked that references to the suspension be removed from his personnel file and that a directive be issued that all harassing activities cease. On October 17, 1995, a Step I Grievance Review was held by Anna Stone, an Assistant Deputy Director of DFS. Ms. Stone denied Mr. Cade's grievance, and Mr. Cade was suspended on October 18, 1995.

On October 29, 1995, Mr. Cade filed a Step II Grievance Review. On November 9, 1995, a hearing was conducted by William Rapps. That same day, Mr. Cade appeared at work without a necktie. A few days later, on November 15, 1995, Mr. Cade again came to work without a necktie. On November 20, 1995, Mr. Cade was notified that he would be suspended without pay for three days because of his refusal to respond to the repeated directives of his supervisors that he wear a necktie to work.

On November 22, 1995, Mr. Cade filed a Step I Grievance regarding the three-day suspension. He was notified that review of his grievances would be consolidated into one proceeding because the issues were substantially the same. Mr. Cade was suspended for three days without pay on December 5, 6, and 7, 1995. On December 26, Mr. Cade filed a request for a Step III Grievance.

On January 10, 1996, Director Schultz sent Mr. Cade a letter responding to his Step II Grievance, denying his appeal. On February 1, 1996, a Step III Grievance Panel, designated by the Director of the Department of Social Services, Gary Stangler, was convened. No taped or stenographic record of the grievance proceedings was made. DFS presented no evidence and called no witnesses. On February 13, 1996, the chair of that panel, Annie Tremain, issued a letter to Mr. Cade denying his appeal.

Mr. Cade filed a petition for judicial review with the circuit court on March 13, 1996, claiming that the circuit court had "subject matter jurisdiction pursuant to Section 536.100 through and including 536.150, RSMo (1994)." The circuit court found it had jurisdiction to review the matter as a contested case pursuant to Section 536.101(2), RSMo 1994. A hearing on the matter was held on October 27, 1997. The parties stipulated to the record of the grievance procedures. Mr. Cade was allowed to present evidence at the hearing and DFS was allowed a limited response, based upon evidence Mr. Cade had presented at the hearing. The trial court reversed the agency's decision, finding that the decision to suspend Mr. Cade was unsupported by competent and substantial evidence upon the whole record and was arbitrary, capricious and unreasonable. The trial court ordered that Mr. Cade's suspension be reversed, that adverse information relating to the suspension be removed from Mr. Cade's file, and that Mr. Cade be reimbursed for costs. *Cade*, 990 S.W.2d at 34–36.

On June 9, 1997, while the case was pending in the trial court, the Missouri Department of Social Services revised its dress code policy. The new policy provided that, "Division directors or designees may establish divisional dress code policies, and management has discretion to determine whether an employee is dressed appropriately."

The Division of Family Services (DFS) appealed the trial court's judgment to this Court. *Id.* at 32. DFS argued that the trial court erred "(1) by treating the matter as a contested case; (2) by deciding that the Deputy Director of DFS does not have the authority to enforce reasonable dress code requirements; and (3) by awarding Mr. Cade his costs in this action." *Id.* at 36. On appeal, we held that

the trial court erred in its treatment of the matter as a contested case, *id.*, and that the "appropriate procedure would have been for the trial court to take up the matter *de novo*, under the standards for noncontested cases." *Id.* at 39.

Also on appeal, we found that the establishment of a dress code was within the authority of the Division of Social Services. We found, however, that we could not determine the question of whether Deputy Director Matt had the authority to establish a dress code and whether neckties were an appropriate mode of dress, because the answers to both of these questions depended on facts that were not fully developed on the record before us. *Cade,* 990 S.W.2d at 40. Accordingly, we remanded the case to the trial court so that Mr. Cade and DFS could present further arguments on these issues and the trial court could determine the matter under the standards governing appeals of noncontested cases.

Following the remand from this Court, the trial court conducted a new hearing in the matter on December 15, 1999, after which it made the following relevant findings of fact and conclusions of law:

1. The Missouri Department of Social Services is authorized to establish a dress code for its employees. *Cade v. Missouri Department of Social Services,* 990 S.W.2d 32 (Mo.App. W.D. 1999). *See also, Fountain v. Safeway Stores, Inc.,* 555 F.2d 753 (9th Cir.1977).

2. In its remand of this case to this court, the Missouri Court of Appeals, Western District, observed "[t]he questions of whether [Richard] Matt had the authority to establish dress code requirements and whether neckties are considered an appropriate mode of dress cannot be properly determined in this appeal." Based on the evidence and arguments of the parties, this court will now address those specific questions.

3. As noted above, the Missouri Department of Social Services has, and had, the authority to establish a dress code.

4. Pursuant to that authority, the Missouri Department of Social Services had, by May 1, 1987, promulgate[d] a dress code setting forth general guidelines and providing that "all requirements should be *developed* with this standard (i.e., reasonableness) in mind." (emphasis supplied) . . .

5. The court *concludes* that the *authority could be delegated* and *had been delegated to Richard Matt,* as Deputy Director (Children's Services), to develop, to implement and to enforce dress code requirements.

6. . . . It would be *impractical* for the Director of the Department of Social Services to promulgate detailed dress codes for *all* the divisions of his department in all of the counties across the state where such agencies have offices.

7. The court concludes that, springing from the department's given authority to promulgate a dress code, there is an inherent authority to delegate the development, implementation and enforcement of the dress code not only to division directors but also to deputy division directors because of their decision making authority within the agency . . .

8. Further, the court concludes that the Director of the Division of Family Services at the time of these incidents *had, in fact, delegated to Richard Matt the authority* to develop, implement and enforce a dress code within the Children's Services Section.

9. Further, the court concludes that it was *reasonable* to require men, who work in a high traffic area visited by legislators, representatives of the execu-

tive branch, members of the public and press, as well as other state and federal agencies, to wear a necktie as part of their overall attire.

10. Further, the court concludes that Plaintiff, James Cade, had adequate, actual notice of the dress code requirement . . .

11. The court concludes that the decision of the Division of Family Services to suspend Plaintiff, James Cade, for a period of four (4) days was constitutional, lawful, and reasonable, it was not arbitrary, not capricious, and not an abuse of discretion.

(emphasis added). In accordance with these findings and conclusions, the court entered judgment in favor of DSS and against Mr. Cade. Mr. Cade now appeals.

## II. STANDARD OF REVIEW

██ Judicial review of noncontested cases is governed by Section 536.150.[1] *State ex rel. Smith v. Hous. Auth. of St. Louis County,* 21 S.W.3d 854, 856 (Mo. App. E.D.2000); *Cade,* 990 S.W.2d at 37. In a noncontested case, the trial court "hears evidence on the merits, makes a record, determines the facts and decides whether the agency's decision is unconstitutional, unlawful, unreasonable, arbitrary, capricious, or otherwise involves an abuse of discretion." *Smith,* 21 S.W.3d at 856; *Cade,* 990 S.W.2d at 37. On appeal of an administrative decision in a noncontested case, the appellate court "reviews the decision of the trial court, rather than the decision of the agency." *Redpath v. Missouri Highway and Transp. Comm'n,* 14 S.W.3d 34, 37 (Mo.App. W.D.1999). We will affirm the decision of the trial court unless it "is unsupported by substantial evidence, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously

applies the law." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

## III. AUTHORITY TO SUBDELEGATE

On appeal, Mr. Cade argues that an administrative agency head cannot delegate duties assigned to him or her by statute unless a statute expressly or impliedly permits such delegation. In support, he cites us to *Brown Group, Inc. v. Admin. Hearing Comm'n,* 649 S.W.2d 874 (Mo. banc 1983); *State ex rel. Rogers v. Bd. of Police Comm'rs of Kansas City,* 995 S.W.2d 1 (Mo.App. W.D.1999); and *Jackson v. Bd. of Dir. of School Dist. of Kansas City,* 9 S.W.3d 68 (Mo.App. W.D.2000). These cases, he argues, provide that a statute may be interpreted to impliedly permit subdelegation of duties by an agency head only if these duties are ministerial and that even this may occur only if there is a reasonable basis in the statute for implying the authority to subdelegate.

Here, he argues, the regulation under which the Director subdelegated the authority to establish a dress code does not expressly authorize delegation of dress code authority. And, he argues, since the decision as to what kind of dress code to establish is inherently subjective and discretionary rather than ministerial in nature, it cannot be subdelegated in the absence of such express authority. He concludes, therefore, that the trial court erred in finding that Mr. Matt, the Deputy Director of DFS, had the "inherent" or "implied" authority to establish a dress code. We disagree with his interpretation of *Brown Group, Rogers* and *Jackson,* and further find that, even were he correct in his interpretation of those cases, they have no application here.

In *Brown Group,* the Director of the Department of Revenue had subdelegated

---

1. All further statutory references are to RSMo 1994 unless otherwise indicated.

the authority to perform the ministerial act of signing tax assessments on the Director's behalf. Mr. Brown challenged his authority to subdelegate, claiming that, because the statute provided that the Director would sign tax assessments, the Director was required to do so personally and could not subdelegate that duty to anyone else. The Supreme Court disagreed. Describing subdelegation as "the transmission of authority from the heads of agencies to subordinates," 649 S.W.2d at 878, the Court held that the "authority to subdelegate need not be expressed in the statute and may be implied if there is a reasonable basis for such implication." *Id.* It found that there was a reasonable basis to imply permission to subdelegate so as to allow "the Director to attend to those important duties required by statute to be performed and to delegate to subordinates the performance of ministerial duties, which he alone could not otherwise discharge." *Id.* at 879.

In *Rogers,* this Court found that the Board of Police Commissioners could not delegate to a hearing officer its duty of holding employee termination hearings, when the board itself was required to render the ultimate decision on whether an employee would be terminated. In our analysis, we found that the duty to hold hearings in employee termination cases was not burdensome and was not a "ministerial act," as described in *Brown Group. Rogers,* 995 S.W.2d at 4. We also found that there was "no express authority in ... [the statute] to delegate the duty of hearing the case to another," *id.,* and that there was no reasonable basis in the statute under which power to delegate such authority could be implied. *Id.*

In *Jackson,* this Court held that the School Board improperly delegated its authority to a three-member committee of the Board to hold Board hearings, such as teacher termination hearings. As in *Rogers,* we found that *Brown Group* was not controlling:

> The reasoning we used to distinguish *Brown Group* from *Rogers* is also applicable in the case at bar. There is no argument that the duty of holding a hearing is so burdensome as to prevent the board from discharging its other duties. In addition, the act of holding a hearing is not a ministerial one. Furthermore, there is no express authority in the Teacher Tenure Act that would allow the board to delegate the duty of hearing the case to the committee of the board, and there is no reasonable basis for implication of the power to delegate here.

*Jackson,* 9 S.W.3d at 71 (citations omitted). *See also Strom v. Automobile Club Inter–Insurance Exchange,* 952 S.W.2d 794, 797 (Mo.App. S.D.1997) (the Director of Revenue did not have to personally certify that a report required by statute was on file with his office, as under *Brown Group* the Director may delegate to subordinates the performance of ministerial duties that he alone could not otherwise discharge).

Mr. Cade attempts to apply the reasoning of *Brown Group* and the other cited cases to the instant case. He concedes that the Director of DFS had the authority to establish a dress code, and, indeed, that *Cade I* so holds, 990 S.W.2d at 40, and that such holding is the law of the case. He also concedes in his reply brief that the "authority to create a dress code *can be expressly delegated* by the Director of the DSS through internal rulemaking channels such as administrative policy making" (emphasis added). He argues, however, that the decision as to what type of dress to permit in a dress code is inherently discretionary and necessarily depends on the nature of one's duties, so that, under *Brown Group,* if the Director wanted to

delegate the authority to establish a dress code, he had to do so expressly and had no authority to delegate that duty by implication.

Mr. Cade goes on to state that, under this analysis, Administration Policy 2–117 as revised in 1997 is an example of proper express delegation by the Director, for it states expressly that "division directors or designees may establish divisional dress code policies, and management has discretion to determine whether an employee is appropriately dressed." By contrast, he argues, Administrative Policy 2–117 as adopted in 1987 and in place at the time that Mr. Cade allegedly violated the dress code, simply stated, "All Department of Social Services (DSS) employees are expected to dress in a manner appropriate to the performance of their duties." He notes that the trial court appeared to find that this language constituted only *implied delegation* of the authority to adopt a dress code, for it did not explicitly state that "deputy directors may establish division dress codes" or use similar language. Therefore, he argues, under *Brown Group* and the other cited cases, the delegation in the 1987 version of Policy 2–117 was not permissible because the duty it delegated—to see that employees are dressed appropriately and to apply the policy fairly— was not ministerial in nature, and the authority to delegate it could not be reasonably implied from the statutes. Since the dress code was an invalid delegation of authority, he concludes, his alleged violation of it could not provide a basis for terminating him. We disagree with Mr. Cade's reasoning on three distinct grounds.

■ First, we do not agree that the court below found that there had been no express delegation to subordinates of authority to develop a dress code. Mr. Cade quotes only portions of the version of Ad-ministrative Policy 2–117 as in force in 1987. In context, that policy stated:

All Department of Social Services (DSS) employees are expected to dress in a manner appropriate to the performance of their duties. Recognizing that the personal appearance of employees can and does create a favorable or unfavorable impression on others, DSS expects all employees to present themselves in a professional manner at all times.

DSS is involved in a multitude of activities, and is in daily contact with virtually all levels of the public and private sectors. For this reason, *the standard of dress will be based on the specific duties being performed.* For example, an employee working in the Warehouse will not be expected to dress in the same manner as an employee representing the Department before a legislative hearing. In all instances, it is expected that an employee's clothing will be clean and well-maintained—and that the employee will observe good grooming and personal hygiene practices.

The following modes of dress are considered inappropriate for office workers during regular business hours:

Bare feet; Bare midriffs; Halter or tube tops without a covering garment; See-through clothing without proper undergarments; Shorts or cut-offs; and Clothing or accessories which create a health or safety hazard.

DSS employees who work in residential care facilities may be allowed to wear more casual attire, including the above styles of dress which are considered inappropriate for office workers. This exemption must be based on the job duties of the individual.

The application of the Department's dress policy will be fair and equitable for all employees who work in similar envi-

ronments. Supervisors are reminded that dress policies may be subject to employee grievances on the basis of *reasonableness; therefore, all requirements should be developed with this standard in mind.*

(underlined emphasis in original, other emphasis added).

This policy does not explicitly state "subordinates may develop dress codes," but Mr. Cade cites nothing that states a policy must be this explicit to constitute express delegation of authority to develop a dress code. Read in its entirety, the policy clearly and expressly states that all employees are to present themselves in a professional manner at all times; that certain types of dress—e.g., bare feet or shorts—are never acceptable for any job; that whether other types of dress are appropriate for a particular job must be determined based on the specific duties being performed; and that "[t]he application of the Department's dress policy will be fair and equitable for all employees who work in similar environments. *Supervisors are reminded that dress policies may be subject to employee grievances on the basis of reasonableness; therefore, all requirements should be developed with this standard in mind.*" (underlined emphasis in original, other emphasis added).

The only way to interpret this language is that supervisors are to develop dress policies and in doing so, they should keep in mind that the policies they develop must be reasonable in light of the particular duties that a person is performing. This is sufficiently specific to qualify as express delegation of authority to supervisors to establish reasonable dress code policies based on their supervisees' job duties.

We interpret the trial court's findings and conclusion to indicate that it, too, found an express delegation. While it never explicitly said that Deputy Director Matt had "express" authority to develop a dress code, it paraphrased the regulation and then said that pursuant to it, authority had been delegated to Mr. Matt:

3. As noted above, the Missouri department of Social Services has, and had, the authority to establish a dress code.

4. Pursuant to that authority, the Missouri department of Social Services had, by May 1, 1987, promulgate[d] a dress code setting forth general guidelines and providing that "all requirements should be *developed* with this standard [i.e., reasonableness] in mind." (emphasis supplied) Exhibit 3

5. The court concludes that authority could be delegated and had been delegated to Richard Matt, as Deputy Director (Children's Services), to develop, to implement and to enforce dress code requirements.

6. .... It would be *impractical* for the Director of the Department of Social Services to promulgate detailed dress codes for *all* the divisions of his department in all of the counties across the state where such agencies have offices.

7. The court concludes that, springing from the department's given authority to promulgate a dress code, there is inherent authority to delegate the development, implementation and enforcement of the dress code not only to division directors but also to deputy division directors because of their decision making authority within the agency ...

8. Further, the court concludes that the Director of the Division of Family Services at the time of these incidents *had, in fact, delegated to Richard Matt the authority* to develop, implement and enforce a dress code within the Children's Services Section.

9. Further, the court concludes that it was ***reasonable*** to require men, who work in a high traffic area visited by legislators, representatives of the executive branch, members of the public and press, as well as other state and federal agencies, to wear a necktie as part of their overall attire.

(italicized emphasis in original, bolded emphasis added).

In so ruling, the court below found that the Director had delegated the authority to promulgate a dress code to Mr. Matt as executive director of Children's Services. As noted, we concur in that interpretation of the policy. While the language of the policy in effect in 1987 was not as clear on this issue as it was after its revision in 1997 (the revision occurring after this suit was filed), it was sufficiently clear so as to constitute an express delegation of authority to develop a dress code.

We do not interpret the court's language in paragraph 7 of its order, stating that there was "inherent" authority to delegate, to be a finding that the policy only impliedly permits delegation. This would ignore the language in the policy stating that supervisors must develop a policy with reasonableness in mind. We think paragraph 7 was simply a recognition by the court that such authority indeed has to be inherent in DSS's given authority to develop a dress code, and the court was simply noting that such authority could be implied from this fact even if such authority were not expressly given to Mr. Matt, as was the case here.

■ But, even if the court's order and the 1987 policy were interpreted to constitute only implied authority to delegate, we do not agree that such implied delegation would be improper simply because the creation of a dress code is necessarily a discretionary function. Mr. Cade's argument in this regard depends on his interpretation of *Brown Group* and its progeny to state that only ministerial duties may be impliedly delegated. This is not a correct interpretation of these cases. Certainly, those cases indicate that ministerial duties are the kind of duties that will most frequently be delegated to subordinates and that the need to delegate ministerial duties could be reasonably implied from the impracticability of requiring the Director himself or herself to perform all such duties for a department with hundreds or thousands of personnel. *Brown Group*, 649 S.W.2d at 879; *Strom*, 952 S.W.2d at 798; *Rogers*, 995 S.W.2d at 3; *Jackson*, 9 S.W.3d at 71.

Neither *Brown Group* nor the other cited cases state that *only* ministerial duties may be delegated, however. To the contrary, they state that the authority to subdelegate may be implied if there is "a reasonable basis for such implication," *Brown Group*, 649 S.W.2d at 878, and in analyzing whether a reasonable basis for the implication exists, we may examine whether the subdelegated duty is either so burdensome in nature as to inhibit the Director from discharging his or her other duties or whether it is ministerial. *Rogers*, 995 S.W.2d at 3; *Jackson*, 9 S.W.3d at 71. If the subdelegated duty would inhibit the Director from discharging his or her other duties, we may imply that a right to delegate that duty in fact exists. *Rogers*, 995 S.W.2d at 3; *Jackson*, 9 S.W.3d at 71. In this case, the trial court held that "[i]t would be *impractical* for the Director of the Department of Social Services to promulgate detailed dress codes for *all* the divisions of his department in all of the counties across the state where such agencies have offices." We agree that because of its impractical nature, we may indeed imply that a right to delegate that duty is inherent in DSS's set authority to establish a dress code.

The analysis set out above is based on the assumption, apparently made by both parties on appeal and in the trial court, that this case is governed by the principles set out in *Brown Group* and similar cases regarding when it is proper to delegate authority that a *statute* gives to a director of an agency to subdelegate duties. Mr. Cade's position was that the *statute* may expressly permit delegation, but if it does not, then delegation is only permitted if it can be implied from the statutory language, if it is reasonable to imply in the situation, and if it finds its basis at least indirectly in some language of the statute.

In the instant case, however, the parties are not quarreling about the proper interpretation of a statute. Indeed, neither of them even cites the court to a statute that they allege is at issue, and both simply state as a given that the Director has the authority to delegate dress code establishment. They simply disagree as to the nature of the language he must use in delegating that authority.

In other words, the parties are quarreling about the proper interpretation of *an agency administrative policy*. Mr. Cade argued that this policy must either expressly delegate dress code establishment authority, or else we must apply the principles set out in *Brown Group* and similar cases to see whether the law permits it to *impliedly* delegate such authority. DSS argues that the authority is either expressly delegated or else it was properly impliedly delegated under *Brown Group*. Neither one recognizes that, even more basically, this case is not governed by *Brown Group* or any of the other cited cases, because none of them purports to state the standards for writing an administrative policy directive of an agency. None of them states that agency heads have to write clearly and delegate duties expressly. Those cases state simply that

*statutes* that give Directors power to delegate duties must either expressly give them such power, or such power must be able to be implied under the *Brown Group* standards. Since, here, the parties concede that the Director can delegate, we do not face a statutory interpretation issue such as that discussed in *Brown Group* and similar cases. While due process and notice requirements may set limits on how clear the Director must then be in the wording of the policy directives he uses to delegate these duties, we are cited to no authority that says his directives have to be so clearly written that all authority delegated by them must be expressly delegated unless the subject of the policy is a ministerial duty.

In other words, *Brown Group* and cases discussing similar principles of *statutory* construction simply do not set the standard by which to judge the policy in this case. We addressed the issues above because that is how the case was argued, but in future cases parties should recognize the distinction we draw between the principles governing statutory construction in regard to the authority to delegate and principles governing interpretation of policy directives that implement an authority that all recognize the Director has—the authority to delegate dress code development should the Director choose to do so.

For the reasons set out above, the judgment is affirmed.

SMART, P.J., and ELLIS, J., concur.